# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL CASE NO. 5:20-cv-00170-MR

FREDERICK PRATT, )
)
            Plaintiff, )
) **MEMORANDUM OF**
    vs. ) **DECISION AND ORDER**
)
)
HAYDEN ROBBINS, et al., )
)
         Defendants. )
_____ )

**THIS MATTER** comes before the Court on Defendants' Motion for

Summary Judgment [Doc. 30] and Plaintiff's Motion to Seal Exhibits [Doc.

42].

## I. PROCEDURAL BACKGROUND

Plaintiff Frederick Pratt ("Plaintiff") brings this action pursuant to 42

U.S.C. § 1983 for the violation of his Eighth Amendment rights while

incarcerated at Alexander Correctional Institution ("Alexander CI") in

Taylorsville, North Carolina, based on the use of excessive force by

Defendants Hayden Robbins, Travis Delozier, and Stephanie Miller, all

identified as officials at Alexander CI.[1] [Doc. 1]. In his unverified Complaint,

_____

[1] Although Plaintiff's Complaint was filed *pro se*, he is now represented by counsel.

Plaintiff alleged that Defendants Robbins and Delozier slammed him face-first to the concrete floor and repeatedly slammed his chin against the floor while choking him and kneeling on his neck, all while he was restrained. Plaintiff alleged that Defendant Miller thereafter ordered Defendants Robbins and Delozier to put Plaintiff in full restraints for eight hours, during which time Plaintiff was denied the use of a toilet and unable to clean the blood off his face. [Id. at 5]. Plaintiff seeks monetary relief only, including punitive damages. [Id.].

Plaintiff's Complaint survived this Court's initial review under 28 U.S.C. §§ 1915(e)(2) and 1915A and Plaintiff proceeded with his Eighth Amendment claim. [Doc. 7]. Plaintiff's counsel appeared in the case on January 18, 2022. [Doc. 27]. After a significant extension of the discovery deadline requested by Plaintiff, the discovery deadline in this case expired on October 31, 2022. [See Doc. 28, 29]. There were no motions to compel discovery responses filed by either party at any time. On November 30, 2022, Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Doc. 30]. Defendants argues that they are entitled to summary judgment because Defendants did not violate Plaintiff's constitutional rights and qualified immunity bars Plaintiff's claim. [Doc. 31]. In support of their summary judgment motion, Defendants submitted a

memorandum; their own Declarations; the Declaration of Medical Records Custodian Amy LaRosa; the Declaration of Jessica Buckner, a Correctional Sergeant who investigated a disciplinary charge against Plaintiff; Plaintiff's North Carolina Department of Public Safety[2] (NCDPS) Offender Information Sheet, a summary of Plaintiff's infraction history, an Incident Report, disciplinary records, the NCDPS Use of Force Policy, Plaintiff's medical records, and limited video footage of the incident.[3] [Docs. 31, 32, 32-1 to 32-13].

After multiple extensions of time, Plaintiff responded to Defendants' motion. Plaintiff provided a memorandum, his own Declaration, his medical records, and the NCDPS Use of Force Policy. [Docs. 41, 41-1 to 41-14]. Plaintiff also moves to seal the medical records he submitted. [Doc. 42]. Defendants replied to Plaintiff's response. [Docs. 44, 44-1 to 41-2].

This matter is now ripe for adjudication.

---

[2] The NCDPS is now called the North Carolina Department of Adult Corrections (NCDAC). The Court, however, will refer to it as the NCDPS here in conformity with the forecast of evidence before the Court.

[3] Defendant manually filed the video footage pursuant to the Court's Order at Docket No. 36. [See Doc. 34]. The Court will hereinafter reference this footage as "Doc. 34." As further explained below, the forecast of evidence does not include video footage of the use of force incident at issue. The footage before the Court captures only an incident in Plaintiff's Unit that preceded the use of force incident.

3

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324.  Rather, the nonmoving party must oppose a proper summary judgment motion with citation to

4

"depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record.  See id.; Fed. R. Civ. P. 56(c)(1)(a).  Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  That is, "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts….  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986) (citation and internal quotation marks omitted).

## III. FACTUAL BACKGROUND

The forecast of evidence, in the light most favorable to the non-movant, is as follows.[4]

Plaintiff is a prisoner of the State of North Carolina, having been convicted of first-degree kidnapping on January 17, 2006. [Doc. 32-5 at 1]. Since 2006, Plaintiff has been charged with 49 infractions, including setting a fire, fighting, disobeying orders, and threatening staff. [Doc. 32-6]. Plaintiff's left arm is completely paralyzed and his right arm is partially paralyzed secondary to being hit by a truck while under the influence of cocaine in 2004. [Doc. 41-7 at 2]. On April 11, 2020, Plaintiff was housed at Alexander CI in Green Unit, D-wing. [See Doc. 32-1 at ¶ 2: Miller Dec.]. At this time, Defendant Miller was a Lieutenant at Alexander CI, Defendant Robbins was a Sergeant, and Defendant Delozier was a Correctional Officer. [Doc. 32-1 at ¶ 2; Doc. 32-7 at ¶ 2: Robbins Dec.; Doc. 32-4 at ¶ 2: Delozier Dec.].

The video evidence in this case shows the following. On the afternoon of April 11, 2020, at approximately 4:45 p.m., while a number of Green Unit,

---

[4] The Court notes that Plaintiff's forecast of evidence is directed at undermining Defendants' forecast of evidence rather than presenting his own forecast. [See Doc. 41-13: Pratt Aff.]. Moreover, there are many discrepancies in the evidence before the Court, not only between but also within the parties' forecasts of evidence. As such, the Court primarily limits this recitation to only the forecast of evidence necessary to resolving the motion before it.

D-wing inmates were in the dayroom, Plaintiff left his cell on the lower level and walked toward and stopped at a table. He put his foot on a seat at the table and another inmate helped him fix his shoelaces. Apparently after having been alerted to something, Plaintiff abruptly turned away from the table and ran to his cell. Just as Plaintiff entered his cell, prison staff entered the video frame and proceeded immediately toward Plaintiff's cell. Plaintiff closed the cell door behind him. Plaintiff did not make any phone calls during this time and did not go near the phone. Officers opened Plaintiff's cell door and Plaintiff quickly appeared at the door. Plaintiff was directed out of his cell and escorted by two officers. He was not handcuffed at that time and did not appear to be in any distress. Plaintiff and these two officers exited the Unit. All this transpired in approximately two minutes. From there, it appears that the Green Unit inmates were directed back to their cells momentarily and then evacuated from the wing. Meanwhile, it appears that a fire extinguisher was deployed, and smoke of some sort emanated from Plaintiff's cell. No other inmates can be seen entering or leaving Plaintiff's cell during the over eleven minutes of video footage. From the video footage,

it does not appear that Plaintiff had recently sustained any injury to his face.[5]

[Doc. 34].

Defendants Robbin and Delozier escorted Plaintiff to Red Unit multi-purpose room for a restrictive housing screening by medical staff. [Doc. 32-4 at ¶ 4; Doc. 32-7 at ¶ 4; Doc. 41-2 at 2-4]. At the assessment, which occurred at approximately 5:00 p.m., Plaintiff complained: "I hurt. [M]y nose hurts. I need you to send [me to] the hospital." [Doc. 41-2 at 2]. Plaintiff denied setting the fire in his cell. [Id. at 3]. The nurse reported that there was "[n]o visible deformity to [his] nose" and "[n]o bleeding noted," but that Plaintiff refused to cooperate with his assessment and kept repeating, "I need to go to the hospital." [Id.]. The nurse also reported that Plaintiff became loud and belligerent, and custody escorted him from the treatment room. [Id.]. Plaintiff's forecast of evidence shows that Plaintiff became upset during the

_____

[5] This is the only video footage before the Court. As noted, the forecast of evidence does not include footage of the use of force incident at issue. The forecast of evidence includes only a single Video Recording Request for the footage that is before the Court, which is identified therein as "Video # 188-20-D." [See Doc. 32-13]. The forecast of evidence, however, also includes an Incident Report related to the fire and unanticipated and anticipated use of force events. [Doc. 32-2 at 3]. This Report includes conflicting statements regarding the existence of video footage of the use of force incident. The Investigator Comments by Dale Hunt provided that, "The use of force happens on lower red unit corridor. Camera c143 could be viewed but nothing was being recorded on the server. No recording was made of the use of force." [Id. at 5]. The Reviewing Authority Comments by April Parker provided, however, that "video 0248-20-I" was reviewed and "supports the actions and statements of the involved staff." Parker concluded that "[o]nly the minimum amount of force was used in order to maintain control and obtain a correctional objective." Thus, it appears that footage other than the footage involving the fire was reviewed in preparation of the Incident Report. [See Doc. 41-13 at ¶ 13].

medical assessment because "the COs" were trying to have Plaintiff placed on self-injurious behavior (SIB) status for setting the fire. [Doc. 41-13 at ¶ 18; Doc. 32-1 at ¶ 3]. Offenders on SIB status are isolated without any property and watched on a 24-hour basis by medical staff. [Doc. 32-1 at ¶ 3]. After the medical assessment was terminated, Defendants Robbins and Delozier assaulted Plaintiff in the Red Unit hallway while escorting Plaintiff to restrictive housing. [Doc. 41-13 at ¶ 22]. Plaintiff did nothing to provoke the attack and did not kick or attempt to kick anyone.[6] [Id. at ¶ 24]. Plaintiff's forecast of evidence shows that Defendant Miller was not in Red Unit when the assault occurred, and that she did not witness the use of excessive force by Defendants Delozier and Robbins.[7] [Id. at ¶ 18]. After Plaintiff was placed

---

[6] Defendants' forecast of evidence on the use of force event is as follows. After Defendants Robbins and Delozier and other staff escorted Plaintiff out of the multi-purpose room, he became "more irate and attempted to drop to the floor." [Doc. 32-4 at ¶ 6]. Plaintiff then stood back up and attempted to kick Defendant Delozier. [Id.]. Defendants Delozier and Robbins and other staff placed Plaintiff against a wall in the Lower Red Unit hallway to gain compliance. [Id.; Doc. 32-7 at ¶ 4]. Plaintiff continued to be combative. [Doc. 32-7 at ¶ 4]. Plaintiff was then placed on the floor to gain control. [Doc. 32-4 at ¶ 6; Doc. 32-7 at ¶ 4]. Once Plaintiff was on the floor, leg restraints were applied because Plaintiff had attempted to kick Defendant Delozier. [Id. at ¶¶ 6-7]. Defendant Robbins helped Plaintiff stand up from the ground and Defendants Robbins and Delozier assisted in escorting Plaintiff to the shower, where Plaintiff was secured and his restraints were removed. [Doc. 32-4 at ¶ 6; Doc. 32-7 at ¶ 4]. All force used on Plaintiff was minimal and justified to gain control of and compliance by the Plaintiff. [Id. at ¶ 8; Doc. 32-7 at ¶ 5]. Defendants did not slam Plaintiff's chin on the floor, choke the Plaintiff, or place any pressure on his head or neck, as Plaintiff alleged. [Doc. 32-7 at ¶ 5].

[7] Defendant Miller's forecast of evidence shows that she reported to Red Unit after the Green Unit, D-wing was evacuated. On her arrival, she saw Plaintiff acting irately and disruptively yelling about not wanting to go on SIB as he was leaving the medical room. [Doc. 32-1 at ¶ 2].

in the shower, Defendant Miller consulted with the On-Call Clinician, who determined that Plaintiff did not need to be on SIB precautions. [Doc. 32-1 at ¶ 2; see Doc. 41-13 at ¶ 18]. At 6:00 p.m., Defendant Miller then ordered that Plaintiff be placed in full mechanical restraints due to his attempting to kick staff and believing that he started a fire in his cell, which "put peoples['] lives in danger" and warranted full restraints.[8] [Id.]. Because Plaintiff was placed in full mechanical restraints and not four-point restraints, Plaintiff was able to walk around the cell, use the bathroom, and wash his hands and face while in restraints. [Id.]. Pursuant to NCDAC Use of Force Policy, four-point restraints may be used "to control violent or unmanageable offenders who have demonstrated behavior that presents a significant risk of injury to self or others…. Interim steps such as handcuffs, waist chains, and leg cuffs may be used to control the offender before four[-]point restraints are used." [Doc. 41-14 at 9]. Nonetheless, handcuffs applied that day "cut [Plaintiff's]

---

[8] NCDPS Use of Force Policy requires that anticipated use of force incidents, such as the application of full mechanical restraints, be video recorded. [Doc. 41-14 at 16]. Plaintiff's forecast of evidence shows that Defendant Delozier "took a video on a hand-held video cam," but that this video was not provided to Plaintiff's counsel. [Doc. 41-13 at ¶ 17]. Defendant Delozier denies that he took such footage. [Doc. 44-1 at ¶ 4]. Rather, he attests that no such footage was taken because, when there is a fire, too many inmates need restraints in order to be evacuated and there were not enough available officers. [Id. at ¶ 3]. In any event, no such footage is before the Court now.

wrists." These injuries took approximately six months to heal. [Doc. 41-13 at ¶ 27].

At approximately 7:00 p.m., Plaintiff was examined by a nurse for a use of force assessment. [Doc. 41-3; Doc. 32-1 at ¶ 2]. At this encounter, he complained, "My nose is bleeding and my head is hurting so bad." [Id. at 2]. The nurse documented that Plaintiff had been "punched in the face" "1-5 Hours" previously. [Id.]. The nurse reported that the examination showed a contusion to Plaintiff's right eye, localized swelling, and a coagulated nosebleed. [Id. at 4]. The nurse also reported that Plaintiff was "involved in a fight" and there was "trauma" to his nose and right eye "present." [Id.]. There is no report by the nurse that Plaintiff claimed at that time to have been assaulted by staff. [See id.].

At approximately 2:15 a.m. the next day, Plaintiff's restraints were checked in his cell. His waist chain was removed. The nurse reported that Plaintiff was calm and cooperative and that his pulses were normal. The nurse noted that no physical injuries were "noted or reported." [Doc. 41-4 at 2]. On April 13, 2020, CHA Houston reported to medical that Plaintiff had "slight swelling still to right eye from altercation with another inmate on 4/11/20." [Doc. 41-5 at 2]. Plaintiff was given an ice pack to treat the swelling.

[Id.].  This is the first mention in the medical records of Plaintiff's April 11, 2020 injuries having resulted from an altercation with another inmate.

Plaintiff was charged with setting the fire in his cell on April 11, 2020. [Doc. 32-13 at 4-5]. In his written Witness Statement prepared and signed on April 14, 2020, Plaintiff denied setting the fire in his cell.  He claimed that the video footage between 4:30 and 6:00 p.m. that day "clearly" shows that the inmate housed in D-8 "came while [Plaintiff] was on the phone and threw a lit fire in [his] room.  D-26 also entered [Plaintiff's] room illegally [*sic*]."  [Id. at 19].  A disciplinary hearing was held on April 24, 2020.  [Id. at 9-11]. The Record of Hearing provides that Plaintiff "made a verbal statement at the hearing that is different from his written statement.  He states an inmate came in his cell with the wick in his hand and they fought and this guy set the fire because when they were don[e] fighting, there was smoke in his room."  [Id. at 9].  Plaintiff was found guilty of the charge.  [Id.].

Plaintiff was seen by a nurse on April 27, 2020, with complaint of a lesion on his left wrist secondary to "full restraints last week."  [Doc. 41-6 at 2].  Plaintiff was diagnosed with an abrasion and given antibiotic ointment and band-aids for ten days or until healed.  [Id. at 4].

On May 12, 2020, Plaintiff was seen for a mental health assessment by Emmerita Foster, MSW.  [Doc. 41-7].  Ms. Foster reported that Plaintiff

"continues to report that he was assaulted by several officers and sustained injuries as a result." [Id. at 3]. Plaintiff described his injuries to Ms. Foster and his "expectation to potentially pursue legal action resulting in a financial settlement." [Id.]. Plaintiff reported elevated anxiety and triggering of his PTSD symptoms from the encounter with custody staff. Plaintiff also reported that he was recently caught with Suboxone strips because he relapsed due to the emotional trauma associated with the use of force incident at issue. Ms. Foster noted diagnoses of PTSD, adjustment disorder with anxiety, and history of drug and alcohol use.[9] [Id.].

There is no forecast of evidence that Plaintiff was disciplined for kicking an officer or for fighting with another inmate on April 11, 2020. [See Doc. 41-13 at ¶ 9].

## IV. DISCUSSION

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312,

---

[9] Plaintiff contends that the medical records, including mental health records, produced by Defendants were incomplete. [Doc. 41-13 at ¶ 8]. Plaintiff attests that he had several mental health encounters to deal with the trauma from the incident, but that those records were not produced. [Id.]. Plaintiff also contends that he was seen by physical therapy for his injuries and those records also were not produced. [Id.]. As noted, however, Plaintiff made no motion to compel discovery from Defendants. He cannot now complain that records are missing.

319 (1986).  To establish an Eighth Amendment claim, an inmate must satisfy both an objective component – that the harm inflicted was sufficiently serious – and a subjective component – that the prison official acted with a sufficiently culpable state of mind.  Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

This subjective standard requires proof of malicious or sadistic action by a prison official in order to make out an excessive force claim.  This is because prison "[o]fficials are entitled to use appropriate force to quell prison disturbances."  Williams, 77 F.3d at 761. "Because officials must act 'in haste, under pressure, and frequently without the luxury of a second chance,' deliberate indifference is not a sufficiently rigorous standard."  Id. (citing Whitley, 475 U.S. at 320).  "Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm."  Id. (internal quotations and citation omitted).

Moreover, "[c]orrectional officers do not have to be under physical attack to justify the use of force; they can also use appropriate force 'to preserve internal order by compelling compliance with prison rules and procedures.'"  Shiheed v. Harding, 802 Fed. App'x 765, 767 (4th Cir. 2020) (quoting Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019)).  "'And we

owe officers wide-ranging deference in their determinations that force is required to induce compliance with policies important to institutional security.'" Id. (quoting Brooks, 924 F.3d at 112).

Here, the forecast of evidence in the light most favorable to Plaintiff shows that Defendants Robbins and Delozier assaulted Plaintiff in the Red Unit hallway after Plaintiff's restrictive housing medical screening was terminated. The relevant forecast of evidence shows that Plaintiff did not attempt to kick Defendant Delozier or do anything to provoke an attack. The relevant forecast of evidence also shows that Plaintiff was not charged with any infractions for attempting to assault staff or for fighting with another inmate from the events that day. Finally, the relevant forecast of evidence shows that Defendant Miller was not involved in the assault on Plaintiff and that she ordered Plaintiff to be placed in full mechanical restraints because she believed he started the fire in his cell.

From this forecast of evidence, a reasonable jury could conclude that Defendants Robbins and Delozier applied force for the purpose of causing harm and not to restore order by compelling compliance with prison rules. A reasonable jury, however, could not conclude from the forecast of evidence that Defendant Miller violated Plaintiff's constitutional rights. That is, the forecast of evidence shows only that Defendant Miller consulted with medical

15

staff about the necessity of SIB status and ordered the application of full restraints because she believed, at least in part, that Plaintiff set a fire in his cell, which endangered lives and warranted full restraints. Moreover, Plaintiff's forecast of evidence shows that Defendant Miller was not present in the Red Unit and did not witness the use of force incident there.

The Court, therefore, will deny Defendants' motion for summary judgment as to Defendants Robbins and Delozier and leave the determination of whether these Defendants used excessive force to the jury. The Court, however, will grant Defendants' motion as to Defendant Miller. If this matter proceeds to trial and on proper motion, the Court will address the issue of spoliation and determine whether an adverse evidentiary inference against Defendants Robbins and Delozier may be drawn relative to the potentially missing video footage.

## B. Qualified Immunity

Defendants also claim that qualified immunity bars Plaintiff's claim. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer

violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Defendants argues that they are entitled to qualified immunity because no constitutional violation occurred.[10] [Doc. 31 at 18]. Because the jury must decide whether Defendants Robbins and Delozier violated Plaintiff's constitutional rights, the Court concludes that qualified immunity does not bar Plaintiff's claim against these Defendants. The Court, therefore, will deny Defendants' summary judgment motion as to Defendants Robbins and Delozier on this ground as well. As to Defendant Miller, however, she is entitled to qualified immunity because the Plaintiff has not demonstrated that she violated a constitutional right. Dolgos, 884 F.3d at 178.

_____

[10] Defendants also claim, without support or argument, that any violation that occurred "was not clearly established at the time." [Doc. 31 at 18]. The Court declines to further address this plainly incorrect and unsupported assertion.

## V.  PLAINTIFF'S MOTION TO SEAL

Plaintiff moves to seal the medical records he submitted in response to Defendants' summary judgment motion.  [Doc. 42].  He argues that they "qualify for sealing in accordance with this Court's practice," and advises that Defendants consents to sealing.  [Id.].

Before sealing a court document, the Court must "(1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives." Ashcraft v. Conoco, Inc., 218 F.3d 288, 302 (4th Cir. 2000).  In the present case, the public has been provided with adequate notice and an opportunity to object to the Plaintiff's motion.  Plaintiff filed his motion on March 1, 2023, and it has been accessible through the Court's electronic case filing system since that time.  Moreover, the public's right of access to Plaintiff's medical record is substantially outweighed by the Plaintiff's competing interest in protecting the details of such information.  Having considered less drastic alternatives to sealing these Exhibits, the Court concludes that sealing these records is necessary to protect the implicated privacy interests. As such, the

Court will grant Plaintiff's motion to seal and order that Docket Nos. 41-1 to 41-12 remain sealed.

## VI.  CONCLUSION

For the reasons stated herein, the Court will deny the motion for summary judgment as to Defendants Robbins and Delozier.  The Court will grant the motion as to Defendant Miller because Plaintiff has failed to forecast evidence of a constitutional violation by Defendant Miller and she is, therefore, entitled to qualified immunity.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 30] is **DENIED** as to Defendants Robbins and Delozier and **GRANTED** as to Defendant Miller.   Defendant Miller is **DISMISSED with prejudice** as a Defendant in this matter.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Seal Exhibits [Doc. 42] is **GRANTED**.

The Clerk is respectfully instructed to review the docket in this matter to ensure Docket Nos. 41-1 through 41-12 are properly sealed.

**IT IS SO ORDERED**.    Signed: June 2, 2023

Martin Reidinger
Chief United States District Judge